# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TROY CLANTON, ROSE RABON, and SOUTH START SERVICES, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. CIV-13-717-M ) |
| CHRIS BROGDON, CONNIE BROGDON, KENMETAL, LLC, SENIOR NH, LLC, BAN NH, LLC, LIVING CENTER, LLC, OAK LAKE, LLC, ADCARE OKLAHOMA MANAGEMENT, LLC, ADCARE HEALTH SYSTEMS, INC., and BOYD GENTRY, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## ORDER

Before the Court is Defendants Boyd Gentry ("Gentry") and Adcare Entities'[1] (collectively known as "Defendants") Motion to Dismiss Plaintiffs' Fraud Claim, filed April 4, 2014. On April 25, 2014, plaintiffs responded, and on May 2, 2014, Defendants replied. Based on the parties' submissions, the Court makes its determination.

I.  Background[2]

Plaintiffs allege that on around July 4, 2009, defendant Chris Brogdon ("Brogdon") proposed an agreement between himself and plaintiff Troy Clanton ("Clanton"). Brogdon solicited Clanton and plaintiff Rose Rabon ("Rabon") to assist him in locating and purchasing

---

[1] Adcare Entities consist of defendants Adcare Oklahoma Management LLC ("Adcare Oklahoma"), AdCare Health Systems, Inc. ("Adcare"), and Adcare Holdings, LLC.

[2] The alleged facts are taken from plaintiffs' Second Amended Complaint.

nursing homes in Oklahoma. In return for Clanton and Rabon's assistance, Brogdon agreed to give plaintiff South Start Services, Inc.[3] ("SSSI") the management contracts for the nursing homes. Plaintiffs allege that Brogdon made it clear that he intended to purchase the nursing homes personally and not for defendant Adcare.[4]

Clanton and Rabon located two portfolios of homes, each consisting of five nursing homes, which were known as the Blue Dolphin portfolio and the Harty portfolio. Clanton and Rabon also located two independent nursing homes, Quail Creek and Companion Specialized Health Care. Brogdon acquired the Blue Dolphin portfolio through the Brogdon entities, five newly formed LLCs[5]. Clanton and Rabon completed the Certificate of Need Applications[6] ("CON") for the Blue Dolphin homes, which contained a management agreement between each Brogdon entity and SSSI stating that SSSI would manage the nursing home. Plaintiffs also allege they assisted Brogdon with getting financing for the Blue Dolphin portfolio and assisted with the purchase of the Harty portfolio. Plaintiffs further allege that in reliance on Brogdon's agreement that SSSI would be managing the acquired nursing homes, plaintiffs engaged in a variety of activities, in addition to acquiring the CON for the Blue Dolphin portfolio, which included: "locating the [nursing] homes, touring various [nursing] homes, negotiating starting sales prices,

---

[3] Clanton and Rabon formed SSSI in August of 2007 for the purpose of soliciting management contracts to operate nursing homes.

[4] At the time of the events in this action, Brogdon was an equity holder in Adcare and served as Adcare's Chief Acquisition Officer for the acquisition of nursing homes. He also owned a number of nursing homes personally or through entities controlled by him.

[5] These LLCs, which were owned by Brogdon's wife, defendant Connie Brogdon, are defendants Kenmetal, LLC, Senior NH, LLC, Ban NH, LLC, Living Center, LLC, and Oak Lake, LLC.

[6] A Certificate of Need Application is a regulatory application through the Oklahoma Department of Health, which was required to transfer the nursing homes.

and assisting with acquiring financing." Second Am. Compl. ¶35. Plaintiffs also allege they incurred significant expenses in assisting Brogdon with acquiring the nursing homes.

On or about July 13, 2011, plaintiffs allege that Brogdon notified plaintiffs that he would not be honoring the management contracts with SSSI and that Adcare would be purchasing the nursing homes. Further, plaintiffs allege that on July 28, 2011, Adcare Oklahoma, a Georgia limited liability company, was registered with the Oklahoma Secretary of State, and on July 29, 2011, when licenses for the Blue Dolphin homes were issued, Adcare Oklahoma began managing the Blue Dolphin homes. Plaintiffs allege that Brogdon needed plaintiffs' expertise in obtaining the CONs on the Blue Dolphin nursing homes and that Defendants knew the nursing homes would ultimately be owned and managed by Adcare, not SSSI.

Plaintiffs also allege that Gentry, CEO of Adcare, became aware of Brogdon's alleged intention to acquire the nursing homes for Adcare and to replace SSSI with an Adcare management company. Further, plaintiffs allege that Gentry assisted in "shifting all of the purchases to Adcare, in breaching the management agreements with SSSI and transferring them to Adcare-owned entity, Adcare Oklahoma Management, LLC." Second Am. Compl. ¶52.

Defendants now move, pursuant to Federal Rules of Civil Procedure 8 and 9(b), to dismiss count 5 of plaintiffs' Second Amended Complaint.[7]

---

[7] On April 18, 2014, the Court granted plaintiffs leave to file a Second Amended Complaint to correct a defendant party name. Defendants' responsive pleadings including their motion to dismiss currently before the Court were unaffected. While Defendants refer to plaintiffs' Amended Complaint in their motion to dismiss, in this Order, the Court will be referring and citing to plaintiffs' Second Amended Complaint [docket no. 41].

II. Standard of Dismissal

Rule 9(b) provides, in pertinent part: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud . . . and must set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 726-27 (10th Cir. 2006) (internal quotations and citations omitted). Further,

> Rule 9(b) does not . . . require the pleading of detailed evidentiary matter, nor does it require any particularity in connection with an averment of intent, knowledge, or condition of mind. It only requires identification of the circumstances constituting fraud or mistake. That requirement means . . . that individual plaintiffs should identify particular defendants with whom they dealt directly . . . ; that individual plaintiffs should designate the occasions on which affirmative statements were allegedly made to them - and by whom; and that individual plaintiffs should designate what affirmative misstatements or half-truths were directed to them – and how.

*Seattle-First Nat'l Bank v. Carlstedt*, 800 F.2d 1008, 1011 (10th Cir. 1986).

III. Discussion

Defendants assert that plaintiffs have failed to plead their fraud claims against Defendants with the requisite particularity required by Rule 9(b). Specifically, Defendants contend that plaintiffs never allege that Defendants made any misrepresentations to plaintiffs. Plaintiffs assert their fraud claim has been alleged with sufficient specificity against each defendant to satisfy Rule 9(b).

Having carefully reviewed plaintiffs' Second Amended Complaint, and presuming all of plaintiffs' factual allegations are true and construing them in the light most favorable to

4

plaintiffs, the Court finds that at this stage of the litigation, plaintiffs' fraud claim against Defendants satisfies Rule 9(b)'s particularity requirements. Plaintiffs have alleged a factual scenario in which Defendants were a part of a fraudulent scheme initiated by Brogdon. Plaintiffs allege that Brogdon, Adcare's Chief Acquisition Officer, solicited plaintiffs' assistance in locating nursing homes in Oklahoma for him to purchase personally. Further, plaintiffs allege that in exchange for plaintiffs' assistance, Brogdon agreed SSSI would receive the management contracts for the nursing homes acquired. Once the nursing homes were located and regulatory applications were completed, plaintiffs allege that Brogdon informed them that he would not be honoring his agreement to give SSSI the management contracts of the newly acquired nursing homes, and instead the management contracts went to Adcare Oklahoma.

As to Defendants' involvement in Brogdon's alleged scheme, plaintiffs allege:

> 52. Upon information and belief, at some point prior to July 13, 2011, Gentry became aware that Brogdon intended to acquire the homes for Adcare and replace SSSI with an Adcare management company. Thereafter, Gentry assisted Brogdon in shifting all of the purchases to Adcare, in breaching the management agreements with SSSI and transferring them to an Adcare-owned entity, Adcare Oklahoma Management, LLC.
>
> 53. Boyd Gentry, both before and after becoming affiliated with Adcare, was intimately involved with Brogdon's plans with Plaintiffs, was aware of the promises made to Plaintiffs, and made representations regarding Plaintiffs' management of the homes they relied upon.
>
> 54. After becoming affiliated with Adcare, Gentry questioned Plaintiffs about how they would run the facilities with respect to the accounting and asked Plaintiffs to contact Adcare's Vice President of Finance to explain it. Subsequently, after being provided with that information, Adcare created a

> 55. subsidiary to manage the homes in place of Plaintiffs.
>
> 55. At least as early as July 2010, Gentry was involved with the deal and regularly communicating with Plaintiffs regarding various aspects of their work on the transactions. He also came to Oklahoma to tour some of the homes with Brogdon.
>
> 56. Gentry made a least two visits to Oklahoma which were related to the transactions at issue in this case. During these visits he, along with Brogdon, continued to perpetuate the myth that Plaintiffs would be managing the facilities.
>
> 57. Gentry was involved with the meetings involving Brogdon and the Plaintiffs at which the representations regarding Plaintiffs' management were made. These included a meeting in Atlanta in March 2010 and two meetings in Oklahoma in mid-2010. Gentry was on the Adcare Board of Directors at the time of all three meetings.
>
> 61. Both Brogdon and Gentry were in email communication throughout the acquisition process, including the process of creating the management agreements that were executed by the entities owned by Connie Brogdon and managed by Chris Brogdon.
>
> 62. These agreements were used to obtain regulatory approval, but after that, Plaintiffs were terminated and an entity created by Adcare, of which Gentry was President and CEO at the time, was given the contracts instead.

Sec. Amen. Compl. ¶¶ 53-57 & 61-62. Plaintiffs further allege that the Adcare Entities were involved in Brogdon's alleged scheme by fronting nearly $60,000 in closing costs for the Blue Dolphin portfolio, being directly involved in the purchasing and acquisitions of some of the nursing homes plaintiffs located for Brogdon, and obtaining the management contracts for the nursing homes promised to plaintiffs by Brogdon. In reviewing plaintiffs' Second Amended

Complaint in total, the Court finds these alleged facts are sufficient for this Court to draw the reasonable inference that Brogdon, along with Defendants, continued to misrepresent to plaintiffs that in exchange for assistance with locating nursing homes in Oklahoma for Brogdon to purchase personally, plaintiffs would receive the management contracts of the located nursing homes.

IV. Conclusion

Accordingly, for the reasons set forth above, the Court DENIES Defendants Boyd Gentry and Adcare Entities' Motion to Dismiss Plaintiffs' Fraud Claim [docket no. 37].

**IT IS SO ORDERED this 21st day of November, 2014.**

VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE